**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHN NGUYEN,

            Petitioner,

    v.

KATHLEEN DICKENSON,

            Respondent.

_____/

No. C 11-03324 WHA

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS;
GRANTING CERTIFICATE OF
APPEALABILITY**

**INTRODUCTION**

      This is a non-capital habeas corpus action filed by a state prisoner pursuant to 28 U.S.C. 2254 alleging ineffective assistance of counsel. Respondent was ordered to show cause why the writ should not be granted. For the reasons set forth below, the petition is **DENIED**. There is no need for an evidentiary hearing.

**STATEMENT**

      On September 4, 2007, petitioner John Nguyen was convicted of attempted murder following a jury trial and sentenced to an indeterminate term of 25 years to life consecutive to a determinate term of five years. Petitioner appealed his conviction to the California Court of Appeal, which affirmed in an unpublished opinion dated January 5, 2010. On the same day, the Court of Appeal summarily denied petitioner's state habeas petition. The California Supreme Court denied the petition for review and summarily denied petitioner's habeas petition on March 16, 2011.

United States District Court

For the Northern District of California

1    The following facts are drawn from the decision of the California Court of Appeal on the

2    direct appeal of the petitioner's conviction, *People v. Nguyen*, No. H032459, 2010 WL 22359

3    (Cal. App. Jan. 5, 2010), and are consistent with this Court's own review of the record.

4    By way of overview, on March 21, 2005, petitioner and his friends Tony Nguyen and

5    Hung Nguyen went to the Heo May Café in San Jose.  At the café, they met another group of

6    men, Howson Nguyen, Howson's younger brother Tung Nguyen, and Howson's friends Minh

7    Trinh and Kha Nguyen.  A dispute arose over paying a gambling debt, and the owner asked the

8    men to leave.  Once outside the café, Howson and petitioner got into a physical altercation.

9    While they were struggling, a single shot was fired (by someone other than petitioner), which hit

10   Minh.  More gunshots were then fired.  Minh was shot multiple times and was later taken to the

11   hospital in critical condition, but survived.  (Because many of the witnesses have the same last

12   name, for ease of reference this order may refer to them by their first names.)

13        **1.        THE PROSECUTION'S CASE.**

14        The critical question was whether petitioner was a shooter.  The prosecution's case

15   proceeded as follows.

16        Howson, the friend of Victim Minh, was a key witness for the prosecution.  He testified

17   that, after the men were kicked out of the café, petitioner acted as if he wanted to fight.  In the

18   parking lot outside the café, petitioner swung at Howson, hitting him in the head.  Howson then

19   ducked down and grabbed petitioner's shirt.  A gunshot was fired, at which point Howson pulled

20   petitioner down to the ground, turned around, and ran.  Howson's friend Kha followed.  When

21   Howson reached the end of the café parking lot, he realized that he had lost his car keys.  He

22   could still hear gunshots coming from in front of the café, so he ducked down between two

23   parked cars.  Kha also ducked down and hid about three or four cars away from Howson.

24   Howson testified that he heard gunshots for about twenty to forty seconds.  After the gunfire had

25   ceased, Howson received a call on his cell phone from Minh, who said that he had been shot.

26   Howson went back through the parking lot and saw Minh lying on the ground bleeding.  Howson

27   did not say that he saw the shooter(s).

28

**United States District Court**
For the Northern District of California

1    Howson testified at trial that he picked petitioner's photo out of the photo lineup and

2    identified him as the man with whom he had been fighting.  He similarly identified petitioner at

3    the preliminary examination and at trial as the man with whom he had been fighting.

4    Victim Minh testified that he watched Howson and petitioner struggling outside the café.

5    Minh ran when he heard the first gunshot, but fell to the ground and realized he had been shot in

6    the lower back.  Continuing to hear gunshots, he crawled between two parked cars to hide.  Minh

7    hid near the front wheel of the driver's side of a black Mitsubishi that had been backed into its

8    parking stall.  Minh further testified that petitioner came around the car on the driver's side,

9    approaching from the rear of the car.  Petitioner had a gun in his left hand and pointed it down at

10   Minh.  Minh said, "hey, man, you got the wrong guy," and scooted backwards out of the parking

11   stall.  He raised his arms to cover his face when he saw petitioner raise the gun and point it at his

12   body.  The gunshot hit Minh in the arm.  Minh saw a second man lean over the hood from the

13   passenger's side of the car and fire at him once or twice.  Minh felt a shot hit him in the stomach.

14   He then saw petitioner and the other man get into the car and drive off.  Minh testified that he

15   used his cell phone to tell Howson that he had been shot.  Howson and Kha found Minh lying on

16   the ground in the parking lot.

17   Minh testified that on the morning of March 23, two days after the shooting, Howson

18   visited him at the hospital.  Minh asked Howson what had happened.  Howson told Minh that

19   they had gone to the café in order to collect some money.  He said that Hung (petitioner's friend)

20   owed Tung (Howson's brother) money from a gambling debt, and that Hung had called to tell

21   them to come collect it.  Howson asked Minh who shot him.  Minh responded that it was the man

22   who had been fighting with Howson.  Howson said that the man was named "John."

23   Minh testified that he had picked petitioner's photo out of the lineup and that he was sure

24   petitioner was one of the men who shot him.  This was because petitioner, who Minh identified

25   at trial, was the same man who fought with Howson and because petitioner stood right in front of

26   Minh prior to shooting him.

27   Tung, Howson's younger brother, testified that he saw petitioner shoot Victim Minh.

28   Tung testified that, when he heard the gunshots, he ran and hid behind a car elsewhere in the

3

**United States District Court**
For the Northern District of California

1    parking lot.  Tung saw Minh fall down beside another car, and then saw petitioner stand over

2    Minh and shoot him one or two times before getting into a car.  Tung did not see anyone else

3    shoot Minh.  Tung was afraid, so he ran across the street to a 7-Eleven store.  Tung was

4    interviewed about the shooting by the police that night, and on several occasions thereafter.

5    Tung testified at trial that he only saw one man shoot Minh, that he knew the shooter as John

6    Nguyen, the petitioner.  On cross-examination, Tung admitted that he had never told the police

7    that he saw petitioner shoot Minh (Reporter's Tr. at 460).

8         San Jose police officers responded to the scene, took photographs, and secured the scene.

9    Officers photographed and collected 13 nine-millimeter shell casings and two .380-caliber

10   casings.  Officers interviewed Howson, who gave them a statement.  Howson later admitted that

11   the statement he gave left out certain information, including that he had gone to the café to

12   collect a gambling debt and that the person he had been fighting with was named John (*id.* at

13   300).  Howson testified at trial that he did not tell the police everything because he was

14   concerned for his and his family's safety.  The police found Tung at the nearby 7-Eleven.  Tung

15   did not tell the police what he had seen.  He testified at trial that he did not provide any

16   information because he was afraid.  Officers also interviewed Kha about what he had seen.

17        Officer Parker Hathaway, who was assigned as an investigator on the case, testified that

18   he had received reports that approximately two hours after the incident, petitioner's friend Hung

19   called 911 and reported that he had received a gunshot wound to his leg.  At the time of his call,

20   Hung was at the 7-Eleven store across the street from the café.  Officers responded and seized

21   Hung's car, a white Honda, from the cafe's parking lot.  Hung's hands were swabbed and the

22   clothing he was wearing was seized.  Testing in the county crime lab revealed that no gunshot

23   residue was detected on the swabs, but gunshot residue was found on the right waistband area of

24   Hung's pants.  Because of this, Hung became a "person of interest."

25        Officer Hathaway also testified that he contacted Minh at the hospital the morning after

26   the shooting, March 22, but was unable to interview him in detail due to Minh's condition.  On

27   March 23, sometime after Howson had visited Minh, Officer Hathaway spoke to Minh in the

28   hospital.  Officer Hathaway testified that Minh said that Tung was arguing with a man inside the

4

café over a debt.  They all went outside, where a man verbally confronted Howson.  Minh heard a gunshot and felt numb.  He knew that he had been shot, because his leg went numb after he heard the shot.  Officer Hathaway further testified that Minh said he then tried to crawl to the parking lot area to hide by a parked car.  Minh told him that the same man who had struggled with Howson came and shot Minh while he was on the ground by the parked car.  Minh did not tell the officer that there was a second shooter (*id.* at 678).

On March 24, Officer Hathaway spoke to Howson at the police station.  Howson said he had been in a fight with a man named "John" over a gambling debt.  He said that "John" was 23 years old, about five feet eight inches tall with a medium build, and that he had been wearing a red long-sleeved collared shirt over a white T-shirt and a white or gray sweatshirt.

Officer Hathaway further testified that Tung, Howson's brother, was interviewed over the telephone by Officer Thuy Le.  On April 16, 2005, Tung was shown a photo lineup containing a photo of Hung.  Tung pointed out Hung's photo and gave the officer contact information for Hung and Hung's brother, Tony.

Officer Hathaway interviewed Hung in September 2005, who was a "person of interest" because he had been shot the night of the incident and testing indicated that he had gunshot residue on his clothing.  Hung was cooperative until he was asked specific questions about the incident, at which point he asked for a lawyer and the interview concluded.  Officer Hathaway tried to determine who Hung's associates were.  He was "able to associate" petitioner with Hung because "they had been contacted together at a previous time."

Officer Hathaway further testified that, about a year after the incident, Kha, Minh, Howson, and Tung were shown some photo lineups.  Kha picked out petitioner's photo.  Victim Minh identified the photo of petitioner as "John," the person who argued with Howson and who shot Minh while Minh was lying by the car in the parking lot.  Minh also identified the photo of Tony as the man Minh thought may have shot him while leaning over the hood of the car. Howson picked out petitioner's photo from the photo lineup as the person he had been fighting with.  Tung was shown the photo lineups and pointed out petitioner.  Tung told police that petitioner was sitting with Hung at the café, that petitioner and Howson argued, and that

United States District Court

For the Northern District of California

1   petitioner hit Howson outside the café prior to the shooting.  Tung did not say that he had seen

2   petitioner shoot Minh.

3          Petitioner was arrested in April 2006.  Officer Hathaway testified that petitioner told him

4   that Hung was his barber around the time of the incident.  Petitioner further told the officer that

5   he had not talked to Hung in six or seven months because Hung had "disappeared."  Petitioner

6   also said that he knew Hung's brother Tony.  Petitioner owned a brown Honda.

7          **2.      THE DEFENSE'S CASE.**

8          Petitioner was represented at trial by Attorney David Johnson.  Petitioner testified on his

9   own behalf that he is right-handed, not left-handed.  He further testified that he did not have a

10  gun on the night of March 21, 2005, and that he did not shoot Minh.  Petitioner went to the café

11  that night with his friend Tony, who told petitioner that Tony's brother, Hung, owed some

12  money.  Tony drove petitioner to the café and Hung arrived later.

13         Then, the other group of men came into the café (Howson, Tung, Minh, and Kha).  There

14  was a disagreement over the debt, which was gambling-related, and petitioner and Howson

15  injected themselves into the discussion.  The disagreement became more heated and the café

16  manager told them to take their argument outside.  The two groups of men went outside, as did

17  several other café customers.

18         Once outside, petitioner saw Howson approach and, thinking that Howson was going to

19  hit him, petitioner tried to hit Howson.  Howson grabbed petitioner's shirt and they struggled.

20  Petitioner fell to the ground.  He then heard a number of gunshots.  Because he was scared,

21  petitioner ran out of the parking lot and hid by a mobile home.  After a few minutes, petitioner

22  saw Hung limping towards him, carrying a gun.  Hung said that he could not run any farther but

23  told petitioner to keep going.  Petitioner walked home, about five miles away.

24         Petitioner saw Hung the next day.  Hung said that he had been at the hospital and that he

25  "got one of the guys good."  After that, petitioner did not see Hung again.  Contrary to the

26  foregoing, petitioner told Officer Hathaway in April 2006 that he did not know anything about

27  the shooting.  He told the officer this because he did not want to "get involved" and did not want

28  to "snitch" on Hung, the person of interest to the police.

United States District Court

For the Northern District of California

1    The defense called Officer Le as a witness, who testified that he and Officer Hathaway

2    interviewed Minh at the hospital on March 22, the day after the incident.  Minh said that Tung

3    began to argue with some men inside the café about a gambling debt.  After everyone went

4    outside, the men fought with Tung.  Minh said that he was shot when he was two feet from the

5    front door of the café.  After he was shot, he fell to the ground.  The shooter walked up to him,

6    called him a "motherfucker," and shot him three or four times at close range.  Minh said that he

7    could not remember what happened next.  He described the shooter as being about 25 to 26 years

8    old, five feet seven inches tall, 150 pounds, and wearing a black jacket.  Minh did not say that

9    the person who shot him was named "John."

10    Officer Le further testified that officers interviewed Minh again the following day, March

11    23.  Minh said that Howson was fighting with someone; during this time, someone came up from

12    behind Minh and shot him in the back.  Minh fell to the ground and crawled to a parked car for

13    safety.  He was lying next to the driver's side door of a black Mitsubishi when the person who

14    had been fighting with Howson walked towards him and shot him four times before getting into

15    the Mitsubishi and leaving the area.  Minh did not mention a second shooter at that time.

16    David Flores, a private investigator, testified that he took measurements at the café and

17    determined that the distance from the front door of the café to the far end of the parking stall

18    where Minh was found was 57 feet five inches.

19    Neither Hung nor his brother Tony were available to testify at trial.  Hung was

20    questioned once by Officer Hathaway about six months after the shooting, but officers were

21    unable to find him again before the trial, or since (*id*. at 848).  Tony had a warrant out for his

22    arrest, but police were unable to locate him at the time of the trial (*id.* at 761-62, 781).

23                          *                    *                    *

24    The jury found petitioner guilty of attempted murder and found that petitioner personally

25    and intentionally discharged a handgun and that he personally inflicted great bodily injury upon

26    a person not an accomplice during the commission of the offense.  The jury found that the

27    attempted murder had not been proven to be willful, deliberate, and premeditated.  The trial

28    judge sentenced petitioner to the indeterminate term of 25 years to life consecutive to the

United States District Court

For the Northern District of California

1  determinate term of five years.  The court struck the bodily-injury enhancement.  According to

2  the probation officer's report, submitted to the court at sentencing, petitioner was 25 years old at

3  the time of sentencing and did not have a prior criminal record (Clerk's Tr. Exh. 2 at 286–87).

4      Petitioner filed the instant federal petition for writ of habeas corpus on July 7, 2011.  The

5  petition asserts two ineffective assistance of counsel claims:  (1) trial counsel rendered

6  ineffective assistance by failing to present a ballistics expert at trial, and (2) trial counsel

7  rendered ineffective assistance when he failed to present exculpatory evidence from three

8  witnesses who would have testified on petitioner's behalf.  The petition also includes a claim for

9  relief based on actual innocence.  Included with the petition are three declarations from

10  witnesses who claim to have been at the café on the night of the shooting, two declarations from

11  alleged expert witnesses, and a declaration from petitioner's trial counsel.  These declarations

12  were all included with the state habeas petition.  The record presented in this federal action was

13  presented in full on the state habeas application, which was denied without comment.

14      Here, respondent was ordered to show cause why a writ should not issue.  Respondent

15  filed an answer, along with a supporting memorandum.  Petitioner then filed a traverse in

16  response.  The parties were requested to file supplemental briefs based on a point of dispute in

17  the parties' briefs regarding whether petitioner, his counsel, the police, or the prosecution

18  withheld information about the three fact witness declarants prior to or during trial.  Following a

19  status conference, the parties filed supplemental briefs regarding the district court's authority to

20  hold an evidentiary hearing regarding ambiguous and/or disputed issues of fact in declarations

21  submitted with the petition.

22                                              **ANALYSIS**

23  **1.      THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT.**

24      Pursuant to AEDPA, a district court may not grant a writ of habeas corpus with respect to

25  any claim that was adjudicated on the merits in state court unless the state court's adjudication of

26  the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable

27  application of, clearly established Federal law, as determined by the Supreme Court of the

28  United States; or (2) resulted in a decision that was based on an unreasonable determination of

8

the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d).  A

state court's decision is "contrary to" clearly established United States Supreme Court law if it

fails to apply the correct controlling authority or if it applies the controlling authority to a case

involving facts materially indistinguishable from those in a controlling case, but nonetheless

reaches a different result.  *See Williams v. Taylor*, 529 U.S. 362, 404, 413–14 (2000).  A decision

constitutes an "unreasonable application" of United States Supreme Court law if "the state court

identifies the correct governing legal principle . . . but unreasonably applies that principle to the

facts of the prisoner's case."  *Id*. at 414.  "[A]n *unreasonable* application of federal law is

different from an *incorrect* application of federal law."  *Harrington v. Richter*, —— U.S. ——,

——, 131 S.Ct. 770, 785 (2011) (citing *Williams*, 529 U.S. at 410) (emphasis in original).  A

federal court must presume the correctness of the state court's factual findings, and the

presumption of correctness may only be rebutted by clear and convincing evidence.  28 U.S.C.

2254(e)(1).

   "[A] federal habeas court may not issue the writ simply because the court concludes in its

independent judgment that the relevant state-court decision applied clearly established federal

law erroneously or incorrectly.  Rather, that application must be objectively unreasonable."

*Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003).  "While the 'objectively unreasonable' standard

is not self-explanatory, at a minimum it denotes a great[ ] degree of deference to the state

courts."  *Clark v. Murphy*, 331 F.3d 1062, 1068 (9th Cir. 2003).  Holdings of the Supreme Court

at the time of the state-court decision are the only definitive source of clearly established federal

law under AEDPA.  *See Williams*, 529 U.S. at 412.  While circuit law may be "persuasive

authority" for purposes of determining whether a state-court decision is an unreasonable

application of Supreme Court law, only the Supreme Court's holdings are binding on the state

courts and only those holdings need be applied, and then only reasonably.  *See Clark*, 331 F.3d

at 1070.

   **2.    REVIEW OF STATE COURT SUMMARY DENIAL.**

   When presented with a state-court decision that is unaccompanied by a rationale for its

conclusions, a federal court must conduct an independent review of the record to determine

whether the state-court decision is objectively unreasonable. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). This review is not a "de novo review of the constitutional issue"; rather, it is the only way a federal court can determine whether a state-court decision is objectively unreasonable where the state court is silent. *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "[W]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 131 S.Ct. at 784.

As stated recently by the Supreme Court in *Pinholster*, a federal court's review under Section 2254(d) "focuses on what a state court knew and did." *Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S.Ct. 1388, 1399 (2011). Under California law, a "summary denial of a habeas petition on the merits reflects that court's determination that the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief." *Id.* at 1403 n.12 (internal quotation and citation omitted). A California appellate court reviewing a habeas petition must determine whether, assuming the petition's factual allegations are true, the petitioner would be entitled to relief. "If no prima facie case for relief is stated, the court will summarily deny the petition. If, however, the court finds the factual allegations, taken as true, establish a prima facie case for relief, the court will issue an [order to show cause]." *People v. Duvall*, 9 Cal. 4th 464, 475 (1995). A federal court's review under Section 2254(d) is limited to the record before the state court. *Pinholster*, 131 S.Ct. at 1398.

Our court of appeals has similarly instructed that the federal court should "examine precisely what the state court did" in evaluating a habeas petition. In *Nunes v. Mueller*, 350 F.3d 1045, 1054 (9th Cir. 2003), our court of appeals considered whether the state court's determination that petitioner had failed to establish a prima facie case for ineffective assistance of counsel and that an evidentiary hearing was unnecessary was unreasonable. In holding that the state court's decision rejecting the petitioner's habeas claim was unreasonable under both Sections 2254(d)(1) and (d)(2), the federal appellate court there stated that "it is entirely appropriate — even necessary — that federal courts ask whether the state court applied correct legal principles (in this case, the *Strickland* analysis) in an objectively unreasonable way, an

10

United States District Court
For the Northern District of California

inquiry that requires analysis of the state court's method as well as its result." *Id.* at 1054–55.
*First*, the state court there claimed to have taken the petitioner's claims at "face value," but
unreasonably applied the *Strickland* analysis to the facts. "With the state court having purported
to evaluate [the petitioner's] claim for sufficiency alone, it should not have required [the
petitioner] to prove his claim without affording him an evidentiary hearing . . . . In other words,
it was objectively unreasonable for the state court to conclude on the record before it that no
reasonable factfinder could believe that [petitioner] had been prejudiced." *Ibid*. *Second*,
viewing the state court's findings as a factual determination, our court of appeals determined that
the state court "went well beyond its self-assigned task of assessing [the petitioner's] allegations
for sufficiency. . . ." *Id.* at 1055. Although state-court findings are generally presumed correct
unless rebutted by clear and convincing evidence or based on an unreasonable evidentiary
foundation, the court found that because the state court refused to afford the petitioner an
evidentiary hearing, no deference to the state court's factual findings was required. *Id.* at 1054
(citations omitted). "While there may be instances where the state court can determine without a
hearing that a criminal defendant's allegations are entirely without credibility or that the
allegations would not justify relief even if proved, that was certainly not the case here." *Id.* at
1055.

In the instant case, the state court summarily dismissed the habeas petition and request
for an evidentiary hearing without issuing an order to show cause. Under California law, the
state court's dismissal indicated that the court found that the factual allegations, taken as true,
did not establish a prima facie case for relief. *See, Duvall*, 9 Cal. 4th at 475. Pursuant to
*Pinholster* and *Nunes*, this Court's review will consider whether the state court's rejection of
petitioner's habeas claims without issuing an order to show cause was unreasonable, where it is
presumed that the state court took petitioner's factual allegations as true. As required by
*Pinholster*, Section 2254(d) review is limited to the record before the state court. Again, the
witness declarations included in petitioner's federal habeas petition, as well as the habeas claims,
are the same as those presented to the state court.

11

1        **3.     INEFFECTIVE ASSISTANCE OF COUNSEL.**

2        The Sixth Amendment guarantees the right to effective assistance of counsel.  *Strickland*

3    *v. Washington*, 466 U.S. 668, 686 (1984).  To prevail on a claim of ineffective assistance of

4    counsel, petitioner must show both that counsel's performance was deficient and that the

5    deficient performance prejudiced petitioner's defense.  *Id.* at 688.  To prove deficient

6    performance, petitioner must demonstrate that counsel's representation fell below an objective

7    standard of reasonableness under prevailing professional norms.  *Ibid.*  This requires showing

8    that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed

9    by the Sixth Amendment.  *Id.* at 687–88.

10        The relevant inquiry is not what defense counsel could have done, but rather whether the

11    choices made by defense counsel were reasonable.  *See Babbitt v. Calderon*, 151 F.3d 1170,

12    1173 (9th Cir. 1998).  Judicial scrutiny of counsel's performance must be highly deferential, and

13    a court must indulge a strong presumption that counsel's conduct falls within the wide range of

14    reasonable professional assistance.  *See Strickland*, 466 U.S. at 689; *Wildman v. Johnson*, 261

15    F.3d 832, 838 (9th Cir. 2001); *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).  The

16    reasonableness of counsel's decisions must be measured against the prevailing legal norms at the

17    time counsel represented the defendant.  *Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003).

18        Under AEDPA, "[t]he pivotal question is whether the state court's application of the

19    *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's

20    performance fell below *Strickland's* standard."  *Richter*, 131 S.Ct. at 785.  The state decision

21    under review need not explain the state court's reasoning, and the habeas petitioner still bears the

22    burden to show there was no reasonable basis for the state court to deny relief.  *Id.* at 784.  To

23    prove counsel's performance was prejudicial, petitioner must demonstrate a "reasonable

24    probability that, but for counsel's unprofessional errors, the result of the proceeding would have

25    been different.  A reasonable probability is a probability sufficient to undermine confidence in

26    the outcome."  *Strickland*, 466 U.S. at 694.  A petitioner must show that counsel's errors were

27    "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.* at 687.

28    The test for prejudice is not outcome-determinative, *i.e.*, defendant need not show that the

United States District Court

For the Northern District of California

1  deficient conduct more likely than not altered the outcome of the case; however, a simple

2  showing that the defense was impaired is also not sufficient. *Id*. at 693.

3       The *Strickland* prejudice analysis is complete in itself. Therefore, there is no need for

4  additional harmless error review pursuant to *Brecht*, 507 U.S. at 637. *Musladin v. Lamarque*,

5  555 F.3d 830, 834 (9th Cir. 2009). This order now turns to petitioner's two claims for

6  ineffective assistance of counsel.

7                **A.    Failure to present expert witness testimony.**

8       Petitioner's claim for ineffective assistance of counsel is based on trial counsel's failure

9  to present expert testimony regarding the ballistics evidence. Petitioner relies on the declarations

10  of two ballistics experts, whose testimony he claims would have demonstrated that the shooting

11  "could not have occurred in the location where Minh testified [petitioner] shot him" (Dkt. No. 1

12  at 18). These declarations were also in the record before the state habeas court. As discussed

13  below, however, the state court's determination that petitioner failed to establish an ineffective

14  assistance of counsel claim was not unreasonable.

15       Fifteen shell casings were found at the scene, including thirteen nine-millimeter shell

16  casings and two .380-caliber shell casings. Six of the casings were found in a cluster 30–35 feet

17  south of where Minh was found and where he testified he was shot. At trial, the prosecution

18  called Officer Hathaway to testify regarding his investigation into the incident. Officer

19  Hathaway also testified as an expert, opining on how shell casings were expelled when fired

20  (Reporter's Tr. at 731–38). In particular, Officer Hathaway testified that both nine-millimeter

21  and .380-caliber casings eject to the right. He further testified that an expelled shell casing could

22  be found on a hard asphalt surface 30–35 feet away from the shooter's location (*id*. at 739–40).

23  The prosecutor relied on this testimony in his closing argument to support the state's theory of

24  the case that Minh was shot by two shooters while he was next to the black Mitsubishi in the

25  parking lot (*id*. at 1002).

26       Petitioner's first expert, Kenneth Moses, states that Officer Hathaway was correct that

27  casings eject to the right, but that he failed to note that casings also travel slightly backward

28  (Moses Decl. ¶ 8). Therefore, if the shooter had been standing between two cars next to the door

1   of the black Mitsubishi, the casings would have hit the side of nearby cars and dropped to the

2   pavement near those locations.  Moses also states that "[f]iring a pistol while it is pointed

3   downward will significantly decrease the distance the ejected casings will travel" (*id*. at ¶ 9).

4   According to Moses, studies indicate that casings ejected from nine-millimeter or .380-caliber

5   pistols "most often end up in a cluster within 20 feet from the shooter if the weapon is pointed

6   parallel to the ground" (*ibid.*).  The second expert, John Murdock, states that the nature of the

7   surface a casing lands on is most determinative of the casing location.  Factors affecting the

8   location of an ejected casing would include the "firearm, ammunition used, surface struck,

9   weather conditions, etc." as well as post-ejection activities such as whether the casing was

10  kicked or run over (Murdock Decl. at ¶ 8).  Unlike Moses's opinion, Murdock's declaration

11  states that "[f]iring a pistol while it is pointed downward will not significantly decrease the

12  distance the ejected casings will travel away from the shooter . . . ." (*Ibid.*).

13          At trial, defense counsel did not put on any experts to contradict Officer Hathaway's

14  testimony, although counsel now professes in a declaration submitted with the habeas petition

15  that he would have obtained one had he known in advance that the state would seek to qualify

16  Officer Hathaway as an expert (Johnson Decl. ¶ 6).  Trial counsel did, however, cross-examine

17  Officer Hathaway and elicited the fact that Officer Hathaway did not base his opinion on any

18  testing done on the specific guns used in the shootings (as none were recovered).  He also

19  elicited testimony that Officer Hathaway could not determine from the location of the casings

20  what direction the guns were fired in or the actual location of the shooter (Reporter's Tr. at 746).

21              ***i.***     ***Counsel was not ineffective under*** **Strickland.**

22          Although trial counsel now contends that he would have obtained an expert, counsel's

23  later statement "runs afoul of the rule of contemporary assessment."  *Hendricks v. Calderon*, 70

24  F.3d 1032, 1039 (9th Cir. 1995).  Based on the inconsistent, if not directly contradictory, expert

25  witness declarations submitted with the habeas petition, it would appear that different expert

26  witnesses' interpretations of the same forensic evidence in this case would likely have been

27  inconclusive, potentially confusing, and ultimately unlikely to be persuasive to a jury.  In

28

1  preparing for trial, counsel could have reasonably determined not to focus on the physical

2  evidence.

3          Moreover, as stated by the Supreme Court in *Richter*, *Strickland* does not require that

4  counsel be prepared for every contingency, including the late introduction of prosecution expert

5  witnesses. *Richter*, 131 S. Ct. at 791.  In *Richter*, the Supreme Court considered whether trial

6  counsel's failure to introduce expert witness testimony constituted ineffective assistance of

7  counsel, where the prosecution presented a previously undisclosed expert to testify about

8  physical evidence at the crime scene.  The Supreme Court found that, even if counsel should

9  have foreseen that the prosecution would offer such evidence, the petitioner "would still need to

10 show it was indisputable that *Strickland* required his attorney to act upon that knowledge." *Ibid.*

11 The Supreme Court stated that "*Strickland* does not enact Newton's third law for the

12 presentation of evidence, requiring for every prosecution expert an equal and opposite expert

13 from the defense.  In many instances cross-examination will be sufficient to expose defects in an

14 expert's presentation." *Ibid.*

15         Here, trial counsel did cross-examine Officer Hathaway, whose direct testimony was, at

16 best, general.  Trial counsel's questioning elicited testimony from Officer Hathaway establishing

17 that his opinion was not based on actual testing of any of the weapons in question, and that he

18 could not actually determine the location of the shooter based on the location of the shell

19 casings.  It was not unreasonable for the state court to determine that counsel's performance was

20 not so deficient as to "undermine[] the proper functioning of the adversarial process" such that

21 petitioner was denied a fair trial.  *Ibid*. (quoting *Strickland*, 466 U.S. at 686).

                              ***ii.     Petitioner failed to demonstrate prejudice.***

23         The expert testimony offered in support of Minh's testimony, as well as the expert

24 witness declarations now offered to contradict such testimony, are not so precise as to allow a

25 conclusion that there is a reasonable likelihood the result would have been different.  Minh

26 testified that he was lying between two cars in the parking lot.  When petitioner approached and

27 began shooting at him, Minh testified that he was backing away from petitioner, moving away

28 from the edge of the parking lot and towards the center.  Even considering Moses's statement

United States District Court

For the Northern District of California

1    that casings from a shooter located between two cars would bounce off the cars, it is entirely

2    possible that some or all of the shots were fired while the shooter was forward enough (in

3    relation to the cars) that ejected casings would not hit the sides of parked cars.  Minh's testimony

4    regarding his location and the location of the shooters was not so detailed and complete that such

5    scenarios would be foreclosed.

6           Furthermore, even if corroborative of petitioner's theory at trial, the physical evidence

7    and expert witness testimony was at best a minor point in comparison to the evidence introduced

8    at trial, which focused on eyewitness accounts directly identifying petitioner as a shooter.  As

9    evidenced by the expert declarations submitted by petitioner and by Officer Hathaway's

10   testimony, reasonably experienced individuals could disagree regarding how to reconstruct the

11   shooting and what factors would be most significant in determining the most probable scenario.

12   A dispute regarding how far, and under what circumstances, shell casings would likely eject and

13   come to rest on the asphalt in the café parking lot would not likely be determinative in relation to

14   the core evidence in the case, which rested on the testimony of witnesses present at the shooting.

15   This order finds that petitioner has failed to establish prejudice on account of counsel's deficient

16   conduct.  Moreover, it was not unreasonable for the state court to so conclude.

17                      **B.      Failure to present fact witness testimony.**

18          Petitioner also claims that trial counsel was ineffective for failing to investigate and

19   present testimony from three fact witnesses who were at the Heo May Café on the night of the

20   shooting.

21          None of the three declarants ever contacted the police regarding the incident, and they

22   were never interviewed by the police or trial counsel.  Kelly avers that he did not hear anything

23   more about the incident until he learned that petitioner was charged with murder, approximately

24   one year later.  Even though he was aware of the charges against petitioner, Kelly did not come

25   forward until after petitioner was convicted.  Jason's declaration states that he "did not come

26   forward after the shooting because [he] was afraid the shooting was gang related.  [He] did not

27   want to be involved because [he] was recently married and expecting a new baby" (Le Decl. ¶

28   9).  Similarly, Philip states that he did not want to be involved because he was scared the

                                                    16

United States District Court

For the Northern District of California

1   incident was gang-related.  Petitioner's trial counsel submitted a declaration stating that he had

2   not been given any information about Jason and Kelly prior to trial (Johnson Decl. ¶ 8).

3         Although none of the declarants contacted the police or defense counsel prior to or during

4   the three-week trial, both Jason and Kelly submitted letters to the court in connection with

5   petitioner's sentencing.  Jason's letter, dated October 8, 2007, stated that petitioner was his

6   cousin and that they have been best friends since petitioner was born (Clerk's Tr. at 305–07).

7   Kelly's letter, dated October 12, 2007, stated that petitioner was a good friend from high school,

8   where they had been on the wrestling team together.  Despite the seeming incongruity in their

9   failure to come forward prior to petitioner's conviction, Jason, Kelly, and Philip's declarations

10  all state that they would have been available to testify to the facts in their declarations if called as

11  a witness at petitioner's trial (Le Decl. ¶ 10; Kelly Decl. ¶ 7; P. Nguyen Decl. ¶ 5).

12                                    *i.*        ***Prejudice.***

13        As a preliminary matter, this order notes that neither Kelly nor Philip's declaration would

14  have added much to the defense's case.  Kelly's habeas declaration states that he saw petitioner

15  wrestling with someone he did not recognize in front of the café.  Petitioner fell to the ground.

16  Kelly did not see anything in petitioner's hand when petitioner got up.  Kelly then lost sight of

17  petitioner as Kelly ran away in the direction of Jason's car and Senter Road, the road to the west

18  of the café and parking lot.  Philip's habeas declaration avers that he picked Jason and Kelly up

19  after the shooting and that they looked for petitioner for a few minutes.

20         At most, Kelly's testimony would have established that petitioner did not have a gun

21  when he stood up after he had been pulled to the ground by Howson (or at least that Kelly did

22  not see a gun in petitioner's hand).  Kelly, however, lost sight of petitioner while Kelly was

23  running away from the café.  Philip was not present at the shooting.  His testimony would have

24  had little probative value, other than as corroborative of the testimony of other witnesses.

25                          **a.        Jason Le Declaration.**

26        Jason Le's habeas declaration, however, is a different matter.  His declaration states facts

27  that, if taken at face value, would contradict the prosecution's theory of the case and support

28  petitioner's testimony at trial.  Jason's declaration states that he drove Kelly to the café that

17

night.  Jason parked his car and the two men walked toward the café.  They noticed a group of people standing in front of the café, among whom Jason recognized petitioner.  Jason saw petitioner struggle with a man he did not recognize and fall to the ground.  Jason also saw Hung, who was arguing and struggling with another man unknown to Jason.  Hung fell to the ground and when he got up, Jason saw that Hung had a gun in his hand.

Jason then heard a single gun shot, although he was not sure where it came from (but recall that the first shot did not come from petitioner even according to the prosecution's case).  He ran back towards his car and towards Senter Road.  As Jason was running, he saw that petitioner was also running towards Senter Road.  Jason then heard about ten more gunshots.  Specifically, the declaration states:

> As I was running toward Senter Road, I saw that [petitioner] was also running out of the parking lot and toward Senter Road.  I did not see anything in his hands.  I then heard more gunshots.  I heard about ten more gunshots, two or three gunshots at a time.  *At this same time*, I saw [petitioner] continue running toward the intersection of Senter and Tully Roads.  I did not see a gun in [petitioner]'s hand.

(Le Decl. ¶ 5) (emphasis added).  That is, *while the shots were being fired*, Jason saw petitioner running away from the parking lot, and away from the parking stall where Minh was found.  A few minutes later, Philip picked up Jason and Kelly and they drove around for a few minutes looking for petitioner but could not find him.  Several days later, Jason picked up his car from the parking lot, which had been parked next to the parking stall where Minh was found.  The car was a Jeep Cherokee with license plate number 4YHR695.  Jason noticed that the car had two bullet holes in it.

Respondent argues that Jason's declaration establishes only that Jason and Kelly heard a single gunshot, after which Jason ran out of the parking lot.  Jason and Kelly then "lost sight of petitioner by the time they heard multiple gunshots, followed by another round of gunshots" (Ans. 12).  A fair reading of the declaration does not support respondent's interpretation.  While it may be possible to pick apart each word of the declaration, read as a whole and assuming the truth of the facts stated therein, the reasonable interpretation based on the face of the declaration is that Jason heard a round of ten gunshots while he saw petitioner run away from the parking lot

18

1    without a gun in his hands.  To the extent that the state court's decision relied on a factual

2    finding such as that now advanced by respondent, such a finding would have been unreasonable.

3            The undersigned judge is well aware that lawyer-prepared declarations in habeas cases

4    are often carefully worded to conceal inconsistencies and gloss over gaps.  In many instances,

5    such declarations fall apart when the witness is cross-examined.  For example, the statement that

6    Jason "did not see a gun" in petitioner's hand begs the question as to whether Jason was in a

7    position to observe, or did actually observe, petitioner's hand.  This type of inquiry, however,

8    generally cannot reliably be based solely on the face of the habeas declarations and is of the type

9    suited to determination after an evidentiary hearing.  Here, the state court summarily dismissed

10   the habeas claims without an evidentiary hearing.  Where a state court "makes evidentiary

11   findings without holding a hearing and giving petitioner an opportunity to present evidence, such

12   findings clearly result in an 'unreasonable determination' of the facts." *Taylor v. Maddox*, 366

13   F.3d 992, 1001 (9th Cir. 2004).  Where the record is silent, however, it cannot be determined

14   whether the state court reached such a conclusion.

15           Respondent also argues that "petitioner cannot show that, even if counsel had discovered

16   at the time of trial that [Jason] was at the scene, [Jason] would have agreed to testify at trial"

17   (Dkt. No. 31 at 9).  In support, respondent points out that none of the three declarants came

18   forward prior to petitioner's sentencing, despite the fact that both Kelly and Jason submitted

19   letters of support to the judge.  Although the state court is not required to accept conclusory

20   statements as true, *Duvall*, 9 Cal. 4th at 474, it would have been unreasonable for the state court

21   to have made a finding that the declarants would not have testified at trial.  They now declare

22   they would have.  It would have been unreasonable for the state court to have decided their

23   statements were not credible, at least without an evidentiary hearing.  Respondent's argument, if

24   accepted, would mean that the state court either did not accept the facts presented in the petition

25   as true, or that the state court based its decision on an unreasonable determination of the facts in

26   light of the evidence presented under Section 2254(d)(2).

27

28

United States District Court
For the Northern District of California

19

**b.     Whether it was reasonably likely that the outcome would have been different.**

Respondent also argues that the prosecution's evidence at trial established that there were several rounds of gunshots fired.  Specifically, after the first gunshot was fired, several more shots were fired for about ten to fifteen seconds.  Minh testified that there was a lull of approximately thirty seconds following this second round of shots (Reporter's Tr. at 552).  Only after this lull was Minh approached and shot multiple times by petitioner and a second shooter.  Thus, respondent argues that Jason's declaration is not inconsistent with the evidence, because petitioner could have run away from the parking lot during the initial shooting, then returned and shot Minh.  Respondent's argument that the habeas declarations are not inconsistent with the prosecution's evidence at trial is supported by the record before the state court.  At trial, however, the prosecutor argued in closing that petitioner came upon Minh "moments" after the fight with Howson and shot Minh (*id.* at 1007–08).

The standard for prejudice is not innocence or exoneration, but whether petitioner has demonstrated "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability *sufficient to undermine confidence in the outcome*."  *Richter*, 131 S.Ct. at 787–88 (quoting *Strickland*, 466 U.S. at 694) (emphasis added).  If the only record before the jury was Jason's habeas declaration, without the benefit of cross-examination, the prosecution's case would have been more difficult to prove.  Petitioner has set forth facts demonstrating a prima facie showing of prejudice based on the substantial likelihood that the outcome would have been different.  It was undisputed that petitioner did not fire the first shot.  Based on Jason's declaration, the prosecution would have had to account for why petitioner ran away from the parking lot without a gun drawn while ten more shots were fired by someone else.  The prosecution would have to establish (beyond a reasonable doubt) that petitioner returned to the parking lot within the 30-second lull of gunfire and shot Minh, which would have been a steeper mountain to climb.

The prosecution's case against petitioner was based largely on two eyewitnesses.  There were no confessions or admissions by petitioner, who testified in his own defense that he ran away from the parking after the first shot was fired.  The physical evidence was inconclusive.

20

**United States District Court**
For the Northern District of California

1   There was no gunshot residue evidence against petitioner.  The prosecution qualified a police

2   officer to testify regarding the location of shell casings in support of the eyewitness accounts of

3   the shooting, but there was no other physical or forensic evidence linking petitioner to the

4   shooting.  Given that the prosecution's evidence relied largely on the credibility of two

5   eyewitnesses, whose stories had been enlarged with time, Jason's testimony would have been

6   strongly corroborative of petitioner's testimony and inconsistent with that of the prosecution

7   witnesses.  The testimony, if believed, would have undermined the prosecution's theory of the

8   case, as it would have established that petitioner ran away from the parking lot without a gun in

9   his hand while the majority (if not all) of the shots were fired.  That petitioner would have run

10  from the violence without a gun visible, then turned around and quickly returned to shoot Minh

11  would have been an unlikely and improbable scenario, and one that the prosecution did not

12  present at trial.  Moreover, Jason's testimony, if believed, would have established that Hung, not

13  Jason, had a gun in his hand right after the first shot was fired.

14          Based on the current record (without the benefit of an evidentiary hearing), this order

15  finds that petitioner was prejudiced within the meaning of *Strickland* by the failure of counsel to

16  present the eyewitness testimony, as the theory of the defense would have greatly benefitted

17  from a corroborating witness.  Additionally, the record of jury deliberations indicates that this

18  was a close case.  The jury deliberated for more than thirteen hours over the course of three days

19  and requested two readbacks of trial testimony (Clerk's Tr. at 255, 255a).  *See, e.g., Mayfield v.*

20  *Woodford*, 270 F.3d 915, 932 (9th Cir. 2001)  (deliberations lasting one-and-a-half days

21  indicated close case in penalty phase of death-penalty trial); *United States v. Kojayan*, 8 F.3d

22  1315, 1323 (9th Cir. 1996) (two-day deliberations indicated close case in drug trafficking trial).

23          To the extent that the state court's dismissal of this claim for ineffective assistance of

24  counsel relied on a finding that petitioner had not established a prima facie showing of prejudice,

25  the state court's decision constituted an unreasonable application of the law to the facts under

26  Section 2254(d)(1), or relied on an unreasonable determination of the facts presented under

27  2254(d)(2).

28

1

2                                  ***ii.***      ***Whether counsel's performance was ineffective***
                                             ***under* Strickland*.**

3          Although the prejudice prong of the *Strickland* test has been resolved herein in

4  petitioner's favor, petitioner is not entitled to relief on his claim of ineffective assistance of

5  counsel.  The record before the state court was clear that, prior to trial, trial counsel had no

6  information about Jason or Kelly, the two witnesses who claim to have witnessed the incident at

7  the café (Johnson Decl. ¶ 8).  Moreover, none of the declarants ever contacted the police.  It was

8  not unreasonable for the state court to determine that petitioner failed to meet the first prong of

9  the *Strickland* test, namely that petitioner failed to show that counsel's representation fell below

10 an objective standard of reasonableness.

11         In *Wiggins v. Smith*, 539 U.S. 510, 526 (2003), the Supreme Court held that counsel's

12 performance was deficient under *Strickland* where the circumstances suggested that counsel's

13 failure to conduct a reasonable investigation into mitigation evidence "resulted from inattention,

14 not reasoned strategic judgment."  Similarly, in *Porter v. McCollum*, 558 U.S. 30, 130 S.Ct. 447

15 (2009), counsel failed to conduct a reasonable investigation of his client's background to prepare

16 a penalty-phase mitigation case in a death-penalty trial.  The Supreme Court found that counsel's

17 decision not to investigate did not reflect a reasonable professional judgment, where he "ignored

18 pertinent avenues for investigation of which he should have been aware," including interviewing

19 witnesses and obtaining records.  *Porter*, 558 U.S. 30, 130 S.Ct. at 453.  It is well established, on

20 the other hand, that counsel may "make a reasonable decision that makes particular

21 investigations unnecessary."  *Strickland*, 466 U.S. at 691.

22         This is not a case in which counsel has refused to give a habeas declaration to explain his

23 conduct, such that an evidentiary hearing and court compulsion are needed to compel his

24 testimony.  Rather, trial counsel *has* provided a declaration to habeas counsel and has cooperated

25 with habeas counsel.  His declaration, expansive on aspects of the trial, merely says, as to the

26 missing eyewitnesses, that he was "not given information" about them.  His declaration,

27 submitted by habeas counsel, does *not* say he conducted no search for witnesses.  For all the

28 declaration reveals, he actually did a reasonable search for witnesses but simply came up empty.

It would have been easy for counsel to add a page or even a paragraph to the declaration

United States District Court

For the Northern District of California

describing the extent of his search.  If trial counsel had refused to do so (and nothing in this record states he did) then habeas counsel could have so described the refusal in his own declaration, but no such declaration was provided to the state court or federal court.  The burden was on petitioner to demonstrate to the state court that counsel's investigation was deficient or at least that trial counsel refused to address the extent of his investigation such that an evidentiary hearing was needed to extract the truth from him.  This burden was not carried.  Consequently, it was not unreasonable for the state court to stand by the presumption that trial counsel had performed at least at the level required by the Sixth Amendment.

Petitioner argues that the witnesses were not undiscoverable.  Counsel could have located Jason based on information establishing that, on the night of the shooting, Jason's car was parked in the stall next to where Minh was shot.  The prosecutor provided counsel with a diagram depicting the parking lot and café.  The diagram noted the license plate numbers and locations of the approximately 60 cars in the parking lot, the location of the shell casings, where Minh's body was found, and other features of the parking lot (Le Decl. Exh. 1).  Jason's Jeep Cherokee was located directly adjacent to where Minh's body was found, as indicated by the license plate number on the diagram.  Respondent replies that neither the police nor the prosecutor's investigation uncovered Jason.  To the extent that Jason could have been discovered based on the diagram of the parking lot, an investigation of roughly 60 license plate numbers was not required by *Strickland*'s standard of representation, or so respondent argues.

Without reaching the latter proposition, this order repeats the fundamental point that trial counsel could have, in the declaration submitted by habeas counsel, told the state court and the federal court what he did to find corroborating witnesses.  Counsel could have explained the extent to which he did or did not track down all 60 cars in the parking lot in a search for potential witnesses.  For all the record shows, he might have tried to track down some of the individuals to whom the license plates listed on the diagram were registered.  The record is silent regarding what trial counsel did.  He could, however, have told us.  This order is unwilling to infer that trial counsel's failure to discover certain witnesses — witnesses who were admittedly seeking to avoid involvement — was the result of an unreasonable or indifferent investigation.  The state

United States District Court

For the Northern District of California

1    court could have reasonably concluded that petitioner failed to meet his burden of establishing a

2    violation of the Sixth Amendment on this record.  See, e.g., *United States v. Rogers*, 769 F.2d

3    1418, 1425 (9th Cir. 1985) (stating that a court "cannot resolve challenges to an attorney's

4    competence from a silent record or by engaging in fanciful speculation.")

5              Neither the state court nor this Court should have to conduct an evidentiary hearing to fill

6    in information that counsel could have supplied.  There is nothing in the record here or before

7    the state habeas court that states that trial counsel refused to set forth in his declaration the extent

8    of his investigation.  Put differently, once trial counsel places a declaration in the habeas record,

9    it should not be so selective as to leave gaps; it should set forth his or her statement on the issues

10   in play (or at least explain why he or she will not do so).  If habeas counsel submits no

11   declaration by trial counsel, he should explain why one was unavailable.

12             "The question under AEDPA is not whether a federal court believes the state court's

13   determination was incorrect but whether that determination was unreasonable — a substantially

14   higher threshold."  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  As discussed above, the

15   petition does not pass review under Section 2254(d) based on the record before the state court.

16   A federal district court reviewing such a record should not hold an evidentiary hearing or

17   otherwise expand the record to fill in the blanks with information that habeas counsel could have

18   provided to the state court from trial counsel but chose not to do.  Petitioner's claim for habeas

19   relief based on ineffective assistance of trial counsel is therefore **DENIED**.

20                    **4.       ACTUAL INNOCENCE CLAIM.**

21             Petitioner contends that he is factually innocent and that he is entitled to habeas relief on

22   this ground.  Petitioner cannot demonstrate that the state court's denial of this claim was

23   unreasonable pursuant to Section 2254(d).  The Supreme Court has never held that a

24   freestanding claim of actual innocence may serve as a basis for a grant of habeas relief.  *Herrera*

25   *v. Collins*, 506 U.S. 390, 400 (1993).  Rather, "[c]laims of actual innocence based on newly

26   discovered evidence have never been held to state a ground for federal habeas relief absent an

27   independent constitutional violation occurring in the underlying state criminal proceeding."

28

24

United States District Court

For the Northern District of California

1    *Ibid.*  The state court's determination that petitioner had not established a prima facie case based

2    on a claim of actual innocence was not unreasonable.

3    **CONCLUSION**

4           The petition for a writ of habeas corpus is **DENIED**.  Judgment will be entered in favor of

5    respondent and against petitioner.

6           Rule 11(a) of the Rules Governing Section 2254 Cases requires a district court to rule on

7    whether a petitioner is entitled to a certificate of appealability in the same order in which the

8    petition is denied.  Petitioner must make a substantial showing that his claims amounted to a

9    denial of his constitutional rights or demonstrate that a reasonable jurist would find this Court's

10   denial of his claim debatable or wrong.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

11          A district court judge may grant a certificate of appealability "only if the applicant has

12   made a substantial showing of the denial of a constitutional right."  28 U.S.C. 2253(c)(2).  The

13   certificate is granted if the petitioner demonstrates "that the issues are debatable among jurists of

14   reason; that a court could resolve the issues [in a different manner]; or that the questions are

15   adequate to deserve encouragement to proceed further."  *Lambright v. Stewart*, 220 F.3d 1022,

16   1025 (9th Cir. 2000) (citations omitted). Any doubt is resolved in the petitioner's favor.  *Ibid.*

17   Petitioner advances three claims.  He has made a substantial showing as to only one of them.

18   Therefore, the **CERTIFICATE OF APPEALABILITY IS GRANTED** only as to petitioner's claim that

19   he was denied effective assistance of counsel due to trial counsel's failure to investigate and

20   present fact witnesses.  Although this Court denied this claim, reasonable jurists might disagree.

21   No certificate of appealability is warranted as to petitioner's claim of actual innocence or

22   ineffective assistance of counsel due to the failure to present expert witnesses.

23          The Clerk of the Court shall transmit the file, including a copy of this order, to the Court

24   of Appeals for the Ninth Circuit.

25

26

27   Dated:  February 1, 2013.

28                                                        WILLIAM ALSUP
                                                         UNITED STATES DISTRICT JUDGE